Good morning ladies and gentlemen. We will hear first in the case of Federal Trade Commission v. Advocate Health Care Network from Mr. Hoffman. Good morning, Your Honors. I'm Matthew Hoffman from the FTC and I'm arguing that both appellants. May it please the Court. The central issue in defining a geographic market for antitrust purposes is what are the practical alternatives a buyer can turn to. And in this case that boils down to a simple question. Can insurance companies, who are the relevant buyers here, successfully market a plan that includes Advocate, North Shore, and other local hospitals in the price increase to keep those hospitals in their market? Can I stop you right there? Because I think one of the central issues in this case is who are the buyers? And you said, as certainly your brief has taken the position, that the buyers are the insurance companies. And so I'd like you to elaborate a little bit on that because there's evidence about patient diversion and so forth and you can talk a little bit about how that fits in with your theory. Sure. Well, the buyers, the insurance companies, are the direct purchasers of hospital services. And in doing the economic analysis of the markets and focusing on, again, the key question here is really whether an outside competitor, a competitor outside the market, can constrain prices inside the The patients are not price sensitive because they pay the same amount for any in-network hospital. So if Hospital A raises its prices, that won't directly impact any patient's choice of whether to go to Hospital A or a competing hospital. So could I trace this through? I'm just trying to These insurance companies are marketing products to probably employers in the area. Primarily employers. Primarily employers. I know there's health exchanges and so on, but primarily employers. And so employers in turn, at least once a year, have to have an open season and they want to see if their employees are going to elect a particular product, whether it's Blue Choice or whether it's People like the product, then the employer doesn't want to buy the product from the insurance company and the insurance company will somehow filter through those preferences. Is that how it works? Yeah, I think that's basically correct. The insurance company wants to market plans that will be attractive to employers. The employers want plans that will meet the needs of their employees. And so your position is if there's a plan that excludes all of the hospitals in this area that you've defined, the North Shore area, I'll call it, that employers would tell the insurance companies, we don't want that plan. And the insurance companies would say, gee, we can't sell this product. That's what I think the insurance companies would say is we'd rather pay a price increase. We'd then try to sell a plan that doesn't include any of those hospitals because people living in those, employers won't want that plan because it doesn't meet the needs of their employees. And that's because the employees, the patients in this area, as in many areas, have a strong preference for local care. And again, there's overwhelming evidence of that. And let me start with the unrebutted expert testimony of Dr. Tan, which showed that 73% of patients living in the North Shore area receive care there. Three quarters of them travel less than 20 minutes to get to a hospital. And of course, if you look at the diversion ratios he calculated, which are not in dispute, roughly half the patients in the North Shore area, if their first choice hospital wasn't available, they would go to a second, to another hospital. Within the area, yeah. And if you look at- So you do, I mean, the district judge was worried that there were other hospitals quite nearby to which consumers could also turn. So explain how that gets factored into the hypothetical monopolist, the SNP test. Well, the district court, I think, really focused on the wrong question and the wrong buyers. And I mean, it's analysis really started and stopped by saying that, look, there are some nearby hospitals and the diversion ratios seem to show that some people are willing to go to these downtown hospitals, Northwestern Memorial being the main one. So is it your position, basically, that the district court, without knowing that it was doing this, was performing an Elzinga-Hogarty test? I don't think that the district court was actually performing Elzinga-Hogarty, and the defendants have argued that it was not. I will say that we think the Elzinga-Hogarty test is not an appropriate test, and the district court's analysis suffers from many of the same flaws as the Elzinga-Hogarty test. I mean, both in that I think it assumes that patients who travel to another hospital will somehow constrain the prices for insurers. And again, it's this payer problem. The district court focused on patients' preferences rather than on the key question, which is, what is a reasonable substitute from an insurer's standpoint? And if you look at the evidence on that point, the evidence overwhelmingly shows, and this comes from both insurers who support the merger and from insurers who oppose the merger, that they don't view downtown hospitals, downtown hospitals like Northwestern Memorial, as substitutes for local hospitals. They couldn't market a plan that only included downtown hospitals. So that has to be the key point of your analysis. If an insurance company put together a package that had none of the hospitals in the North Shore area, but that had Northwestern Memorial, and UIC, and the University of Chicago, and Rush, and some other very fine institutions, but people wouldn't want that because they would say, your expert, I guess, testified that people would not accept that. Our expert, and also I think the insurers themselves testified that people wouldn't want that. But that's exactly right. A plan like that would mean that people living in Highland Park, and Lake Forest, and Waukegan, if they needed to go to the hospital, they'd be forced to drive an hour down to Chicago. Maybe not quite an hour, but traffic can be bad. Depends. As a veteran of Chicago traffic, it depends. So yeah, and the question is, would that be marketable? And from the insurer's perspective, when you look at, if you had a group of hospitals that were under common control, if you had that group there, the insurer's question is, would I rather try and market a network that excludes all of these local hospitals, or am I willing to pay a small but significant price increase to keep those hospitals in network? Now your opponents, oh excuse me, I was just going to say, your opponents argue, and then Judge Hamilton will have a question, that you did not show that this small but significant increase in price would stick for the right length of time, about two years or more. That it's a durable price increase. It's not just an attempt to raise prices that just falls back right away, which we wouldn't care about. I'm not sure that they actually make that argument. I think they argue... I thought the last point in their brief... Was that you didn't prove profitability. Is that you didn't prove profitability. And I think, I mean, that's the argument that I thought they were making, and I think the answer is that Dr. Ten's model certainly took profitability into account. One of the key inputs that he used was the cost margins of the merging parties hospitals, and he used conservative estimates for the other hospitals in the market, as to which he didn't have data, but he relied primarily on the merging parties' own data. And he showed that, in fact, at the levels of intramarket diversion that you see in the North Shore area, a price increase would be profitable, and if it would be profitable, you can expect the hospitals to take it. His analysis, I mean, this is skipping ahead to competitive effects a little bit, but his analysis showed that across the six party hospitals, you would expect to see an 8% price increase, roughly going to about $45 million per year, and he testified that's not $45 million, that's $45 million a year going forward indefinitely. And this is not at all hypothetical. I think it's very helpful to the court to look at the Evanston case decided by the FTC, which involves these very same hospitals. Evanston is what's now known as North Shore, and that case involved the merger of three hospitals to create the core of what's now North Shore. And in that case, the commission didn't bring its case until several years after the merger was consummated. And so we know what happened there, and the fact, the matter is that prices did go up significantly, notwithstanding the fact that all these same hospitals, all these same downtown hospitals that the defendants say constrained prices, were there 10 years ago, notwithstanding the fact that other hospitals and the other local hospitals were there. So it's not at all theoretical or conjectural that a merger of these two large hospital systems, which really dominate the North Shore area, would significantly increase their bargaining leverage and lead to higher prices. I'd like to ask you several questions, if I could, Mr. Hoffman. First about some practicalities, and I'd like to hear from the defense about this as well, which is about the time pressures for our decision. Obviously, mergers are fragile things. What's your sense of the time pressure? There's no time pressure from our perspective. You're happy with the state that's in place? I'm not aware that there's any sort of drop dead date for this merger or any reason why, if it makes economic sense now, it wouldn't make economic sense a month from now, six months from now. Obviously, I know the defendants want to move ahead. It won't be six months, but throughout the transcripts, there are a number of references to slides. Where do we find those in the record? I'm not sure the slides are all in the record. Why not? Because the slides, if you're thinking of that, there probably were demonstrative exhibits used at trial, which were not admitted as exhibits, and therefore, they're not part of the record. They are likely things that are in. That's unfortunate because testimony becomes incoherent without that. I'll ask court staff to follow up and try to make sure that we have everything that was at least actually admitted in the record available to us. We can certainly make that available if the court wants to see it. I'm sure both sides can do that, but I don't believe it's in the record now. I would have to double check that. We may need cooperation from both sides on that. I'd like to follow up on a couple of specific issues that have been debated by the parties. First of all, present St. Francis. Why is it excluded? Nobody seems to think it actually matters, but it winds up making Dr. Tan's market look like it's gerrymandered. It doesn't matter, and I don't think it makes Dr. Tan's market look like it's gerrymandered. I think the reason St. Francis is in there is because of the way that Dr. Tan applies the criteria using reasonable, neutral criteria. The reason present St. Francis isn't in the market is because although it's close to North Shore hospitals and competes with them, it doesn't really compete significantly with Advocate. Right, so you get that particular point which bothered the district judge a great deal, but that's the only one that's in question, right, by that criterion? That's really the only one. The answer is that if you were to relax the third criterion, Dr. Tan testified that that would add four additional local hospitals to the market, one of which is present St. Francis, giving you a 15-hospital market. But as he said, even if that's viewed as the proper market, the market shares and HHI levels would still be such that the merger would be presumptively anti-competitive. And of course, the district court, although it mentioned this point, it never addressed that issue. And that's why I say it doesn't really matter, present St. Francis. The district court's reasoning about present St. Francis was wrong and inconsistent with the merger guidelines, and I'm happy to explain why. The merger guidelines say that the hypothetical monopolist has to be able to impose a SNP at at least one location of the merging parties. And in this case, present St. Francis doesn't constrain, doesn't really significantly compete with advocate and doesn't significantly constrain advocate. So present St. Francis wouldn't prevent the hypothetical monopolist from raising prices at the advocate hospitals or from, or because the advocate hospitals aren't constrained, from some uniform price increase across the system for people who want to make sure they get the advocate hospitals, for insurers who want to make sure they have the advocate hospitals in the network. So that's why Dr. Ten did it. It's certainly a reasonable assumption consistent with the merger guidelines. But again, it doesn't really matter. Again, it's important to recognize there's not necessarily one relevant market here. You know, there could be any- That's clear. Look, we've said there's always room to quibble around the edges, but I'll just tell you that just the optics of excluding presence are extraordinarily bad for that particular map. I'd like to ask you about the diversion ratios and just see if I understand how they fit into this. The implicit assumption seems to be that it is a commercial reality that an insurer is not going to be able to convince people to drive past their first choice and their second choice to their third choice hospital. Is that about right? I think that's about right. I mean, there isn't data on third choices, but the assumption is that insurers, you know, diversion ratios tell you people's first choices and second choices. Well, and then let me ask you to follow up a little bit. The defense has really emphasized the point that your intra-market substitution rates that Dr. Ten has followed are actually a little less than half, right? 48%. And Ten has responded, if I understand correctly, well, as long as it's a quote substantial fraction, then you've got potential for market power here. And he obviously has done the analysis and concluded that there would be market power within this 11-hospital market. But I guess my question is, how substantial is, how big is substantial in that approach? What else does he need to know? How do we quantify that? That sounds like a very fuzzy concept to me. Well, it's not fuzzy, but I think it's mathematically somewhat complicated. I mean, Dr. Ten used a model which used as input both the diversion ratios, focusing on the intra-market diversion ratios and the price cost margins of the hospitals. So, you know, if you hold all the variables constant, except for the diversion ratios, you could determine what threshold is for that thing. But of course, if you change some of those variables, the number could change. I don't think Dr. Ten, he didn't give a range of things or specify a specific threshold. He just said, and I don't think there's a dispute that under his model, his model shows that at that diversion ratio, at that diversion rate, at those intra-market diversion ratios and cost margins, the hypothetical monopolist could impose a SNP. One other question that I wanted to get to, if I could, has to do with this concept that, well, your case is built upon the bargaining model, right? The prices here are going to be set by insurers bargaining with hospital systems, right? And so, there's an argument that systems are going to negotiate system-wide, in essence, right? Or is there evidence in Chicago of price discrimination by hospitals within the same system? I guess my question is, if you're negotiating with a new advocate system that's already merged here, an advocate is present throughout the rest of the Chicagoland area, or at least good chunks of it, how would they be able to extract monopoly profits from the North Shore area hospitals alone? Right. Well, I think that this goes to the way that Brown Shoe and Philadelphia National Bank talk about defining markets. Certainly, an advocate has facilities beyond the two that we're concerned about here and in other parts of Illinois. So, they compete, they do business elsewhere. But what Philadelphia National Bank says is that the question for geographic market determination is not where the parties do business or even where they compete, but where within the system. My point, though, is, look, in the hospital merger area, we're dealing with extra layers of complexity because of the so-called two-stage models, two stages of competition model, right? And we know that Elzinga's model doesn't work as well as Dr. Elzinga himself has said, right? We argue that it doesn't work at all in this context. Exactly. So, I think I understand a lot of your position, but I don't quite understand how an advocate extracts monopoly profits through bargaining if it has to set prices throughout its hospital system. Because even though it has to set prices throughout its hospital system, one factor that goes into those prices is how much insurers are going to need the merge system or, in our construct, the hypothetical monopolist system. I mean, you're really, I think, maybe getting into competitive effects rather than the market definition question. They're not that different, are they? There's close similarities between them, but I think we're focusing on them. The fact of the matter is, though, that a merged entity would have more leverage over insurers because of its ability, because insurers need it for this area. And the fact that insurers may not need, may not have the same need for advocate in other areas of the state doesn't affect the fact that they do have the need for it here. The fact that there might be a monopoly in other parts of the state, or monopoly is the wrong word, doesn't mean that the, you know, that in this North Shore area market, there isn't a problem. I see my time is up. If you would like to save rebuttal time, you're welcome to do that. I would like to save some rebuttal time. Before I do sit down, I would just briefly talk about the remedy that we're requesting. I think we would ask that on this record, we think the government has shown a likelihood of success as a definition of the relevant market, and the court should hold that and then remand the case for further proceedings. And I'll reserve the remainder of my time for rebuttal. All right. Thank you very much. Ms. Coberly. Good morning, and may it please the court. The argument you just heard turns very much, I think, on this idea that insurers require access to the advocate in North Shore hospitals in order to market a plan. But that's a premise that the district court in this case specifically held that the FTC did not prove, as a matter of fact. But I'm not sure the district court was consistent in its reasoning. I mean, at one point, it accepts the product market that the parties are talking about. But then it slips away from that. It says, the district court says, hospitals compete to be included in insurer's networks. That's fine. But then it segues over to patient movements about halfway through the opinion. And I'm concerned that it doesn't follow either model through, actually. Actually, on page five, the relevant product market inpatient general acute care services sold to commercial payers and their insured members. So how do you get that the district court wasn't looking at the insurance dimension here? No, the district court did also look at the insurance dimension. And there is not, this is kind of a false premise that the FTC's argument rests on, that there's this huge difference between what insurers care about and what patients care about. Well, but there is in terms of who's the buyer. I mean, I was concerned that the district court actually didn't understand the hypothetical monopolist test. Well, let me start with the point a moment ago, which is the district court understood and said, in his opinion, that customer preferences, patient preferences drive insurer preferences. And that's what led the FTC's own expert, as well as our expert, to rely heavily on diversion ratios. Not as the only input, but as a very significant input to the analysis. That was Dr. Ten's primary input, was diversion ratios, which do depend on patient preferences. Right, and I was going to say, you guys are kind of the glass is half full, and they're the glass is half empty. Because their view, Dr. Ten's view, is that if an insurer is trying to market a product that half of customers will flee from, the insurer would rather pay a little bit more for the hospital system than lose half of the customers. Whereas you say, oh, half of the people can go down to the University of Chicago or Northwestern or whatever. So doesn't that show that there's competition? But I think you're mixing apples and oranges there. Well, actually it's not half, it's less than But to be clear, it's the diversion ratios that undercut the very testimony that they're relying on. I think the argument you just heard rests almost completely on this idea that insurers can't market a plan that doesn't include these hospitals. So what evidence is there of a commercially successful group policy in the North Shore area that doesn't include this? Blue Choice is marketed to individuals. Is there anything else? Well, Blue Choice is also marketed to employers. And how many have bought it? It is primarily an individual product, and it's not been sold. So what commercial success is there without those hospitals? Well, that's not the test. This has been a very commercially successful product. Would you please answer Judge Hamilton's question? Is there any evidence in the record? There is commercial success with the product for Blue Cross overall. Is it commercially successful in the employer market in that region? Perhaps not. And that's the product market we're talking about, correct? So I think what we're looking at is an empty set of commercially successful group products in that geographic area. Well, there's one product. It, by the way, doesn't include Northwestern Memorial either. So it's not a perfect comparison. This is a product that doesn't include either North Shore or the Northwestern hospitals in this region. What is it? I'm sorry? Which product is it? Blue Choice. And it is commercially successfully sold to employers and groups? Your Honor, I did not say that it was commercially successful. That was my question. It is not commercially successfully sold to employers and groups in that narrow swath of the market. Now, what I can tell you, though, is that that does not make it unsuccessful from Blue Cross's perspective. And again, the FTC's point here is that this narrow employer market is so critical to Blue Cross overall that Blue Cross would pay a snip in order to keep these hospitals in the market. And there is no evidence of that in the record. There is no evidence that Blue Cross's product is not successful for Blue Cross, which competes far beyond that narrow market. And what we care about, according to the FTC, what we care about is Blue Cross's bargaining power. But according to that logic, as long as Blue Cross makes money in Illinois as a whole, we could just have one hospital in Chicago because Blue Cross would be making a lot of money and somebody could go down to Springfield or Carbondale or whatever. Blue Cross is a statewide phenomenon. The way the hypothetical monopolist test works, and it's been very well vetted since 1982 when it was introduced, is you start with the smallest possible market. And if you find that there would be too many constraints on competition within that market from out-of-market things, you say that's not a product market. That's not a good geographic market, whichever one you're testing. And so you expand out. And that's what the commission's expert did here. They started with a small market, added some hospitals to get up to the 11-hospital market. I suppose they could have added the other four that Judge Hamilton was talking about. And the data suggests that insurers do want to serve the North Shore of Chicago. Well, first of all, the FTC's own version of the hypothetical monopolist test doesn't hold that once you calculate a SNP, you're done. It doesn't say any market is okay as long as it satisfies a SNP, even if it excludes the closer competitors. You've relied heavily on example six, which I'm looking at. But what they are pointing out is before you're into example six, you need to find out who is the second best. What is really the closest substitute for product A? There in example six, product C is a closer substitute for product A. And so you would include product C in the relevant market. And I don't see that you have any evidence that there's a product C here. Well, we do have evidence that Northwestern Memorial is the closest substitute for North Shore. It is the first or second best substitute for five out of the six hospitals in this market. And under example six, in fact, the FTC concedes here that once it concluded there was a lot of intra-market diversion, it didn't even look at whether there were closer substitutes outside the market. They said when applying this, you've got to see if there's a second product. And I don't see... You're kind of assuming that if you offered an insurance product that did not have any hospitals in the North Shore area, but that said you can go to Northwestern every day of the week, that insurers, and really filtering it down, employers, employees, would find that as an attractive product. They would accept that as a substitute for a product that let them go to the North Shore hospitals. And I don't see where the evidence exists that that's the case. You want them to go to both. And that's a fallacy. The evidence exists, and it was presented in this case. And that's why ultimately this is a case about a district court reviewing the assumptions of an expert. If you look at the evidence, including evidence attached to the reply brief, supplemental appendix 15, Aetna considered Northwestern Memorial and North Shore to be both candidates to include to fill this geographic hole that they believe... And that was about network adequacy, correct? No, actually not. It continues to that point, but it's also about marketability. If you look in the middle of that page, we do not... The question was, is an advocate-only product... This is a reply supplemental appendix 15. Is an advocate-only product marketable beyond the individual consumer segment? The witness said no. We do not believe it's marketable beyond the individual segment. The geographic breadth is not great enough. So in order to fill that geographic gap, this next passage that I'm relying on, in order to fill that geographic gap, to make the product markable for up to large group employers, as you testified, what other providers did Aetna consider? We considered both Northwestern, Northwestern Memorial, and North Shore. Right. And what I was focusing on was the next question, answer in question, about network adequacy purposes, which I had understood to be dealing with a narrow legal question under Illinois insurance regulation. I agree that the answer to the next question is about network adequacy, but the answer to the prior question is about marketability. And it might be helpful... Go ahead and finish your thought, and I'd like to ask about the elephant in the room. Sure. It might be helpful for me to illustrate why it is exactly that the judge held that diversion ratios undermine this very kind of testimony we're talking about. If I could direct your attention to page A5 of the opening brief. This is testimony from Cigna, which is one of the... Cigna had a witness who testified that North Shore and Advocate were essential to a marketable product. I'm on page A5 of the opening brief. The district court opinion? No, actually, this is after the short appendix. It may be separately bound for you, actually. I think it's separately bound. It's in the supplemental appendix. I apologize. It may be separately bound. It's appendix A5. This is Mr. Norton? Yes. So Mr. Norton is one of the witnesses who the FTC relies upon for this idea that Advocate and North Shore are so critical. So why does Ms. Norton actually believe that this is so critical? Well, here's one explanation. On A5, she says the primary alternative to North Shore Highland Park would be Advocate Condell. But if you look at the diversion ratios, which are presented in Table 9, they're attached to our opposition brief and these are the FTC's own experts. Actually, the primary substitute, the primary alternative for North Shore Highland Park is Northwestern Lake Forest. And it's closely followed by Northwestern Memorial. Northwestern Lake Forest has a diversion ratio of 18.5 from North Shore Highland Park and Northwestern Memorial has a diversion ratio of 17.7 from North Shore Highland Park. Condell, which Ms. Norton believed was the primary alternative to North Shore Highland Park, has only 11.4% diversion ratio. And similarly, if you look further up in that page, she talks about present St. Francis and says present St. Francis is in Evanston, but typically what we've heard from our customers is that Lutheran General is the preferred alternative to North Shore Evanston Hospital. If you look at Table 9... Of course, none of that matters under the merger guidelines, at least. I think you're making a don't use the merger guidelines approach. Oh, not at all, Your Honor. They do say groups of products may satisfy the hypothetical monopolist test without including the full range of substitutes from which consumers choose. You've just got to make sure it includes enough. There are going to be some substitutes that are not in there. But the reason... I was relying on that evidence for a really specific reason, Judge Wood, which is the FTC's argument in this case depends almost completely on a factual premise about how insurers need Advocate in North Shore, not anyone else. And they have actually interesting evidence to back that up, such as what's happened to prices in the past when mergers in this area have occurred. Well, first of all, this is a standard of review issue. This is a clearly erroneous standard. But of course, if the district judge asks the wrong question or mixes up its analytical structures, then that's a prior mistake, so to speak. That's not subject to clear error review. Indeed, but what the district court did in this case is it started with the premise, and you can see this at page 9 of its opinion. It started with the observation that we pointed out, which is that Northwestern Memorial Hospital is the second or third choice for patients who use five of the six party hospitals in the North Shore area. That just facially raises a serious question, given what the geographic market is supposed to be, which is, as we agree, the hospitals to which consumers could practically turn. So faced with that strange result, the district court went back and looked at the assumptions that were presented by its experts, assumptions that my opponent continues to rely upon today. And it examined those assumptions and it found those assumptions to be lacking in terms of circular. They were ignoring commercial realities. They're not circular, they're iterative, the way you build the market from the inside out. But let me ask you about the elephant in the room, which is the 2000 merger, where North Shore's own expert said that prices went up 9 to 10 percent above general hospital inflation rates after that merger occurred, which certainly seems to imply that these markets are quite small and local and that a lot of the other complexity that's been added here is in essence an attempt to distract us from commercial realities. There's the old adage about fool me once, shame on you. Fool me twice, shame on me, comes to mind here. It's telling to me that the FTC is pointing to a merger that was 16 years ago. That's forever in the healthcare world. Things have changed dramatically. The hospitals... People's buying habits apparently have not, though. People's travel habits. I know that you have an element of your argument that essentially inpatient hospital care, your product market, you argue, is a declining market. I don't know whether it's going to level off at some point, but you say there's been a great deal of substitution of outpatient services, which I know that at least I take to be outside the product market for inpatient services. That brings to my mind the idea of a declining market. If it's a declining market, what do you do about mergers? The law has always been that you don't have any special, unless it's actually a failing firm, and nobody says that these are failing firms. You apply the antitrust laws just as you do in any other situation, even if it's a declining market. But I'd like you to talk about how you think we ought to take into account your argument about substitution of non-product market products, that is to say outpatient services, for this case. Absolutely. Well, one of the things that explains the significant difference in the markets over the last 16 years, since that last merger, is the very thing Your Honor is pointing to. That this is a declining market. But I don't see why that means that there isn't a product market for inpatient services. You seem to concede that. We do. And I don't see why that doesn't give room for potential anti-competitive pricing in the product market for inpatient services, even if it's covering only 50% of what hospitals do now instead of 75% of what hospitals once upon a time did. Well, what the District Court did with that evidence, and it was quite well supported by both the record and our experts' testimony, was to explain that because it's a declining market, inpatient services, clearly our product market, are no longer routine. But that's absurd. Nobody goes for certain procedures on an outpatient basis. If you're having heart surgery, you're not going to go in on an outpatient basis. If you're having any number of procedures, it's a smaller number now. I totally agree with you. But it's different in kind, and that's the reason for my comment. Why? Because the plaintiffs say it's different. Because one of the arguments for this idea that local means where you live, and by the way, that's inconsistent with what was pleaded in the complaint. The complaint suggested people use services where they live and work, which would suggest downtown Chicago. But the nature of this concept of local services is based in part on the idea that people want to pursue routine care close to home. And isn't there solid empirical evidence to that effect? That this is my first choice, my second choice is still inside this North Shore area? But there was solid empirical evidence contradicting it as well. I mean, your kid breaks his leg at the baseball game, you don't want to drive all the way into downtown Chicago to Northwestern, you want to go get the legs set. But the diversion ratios, to be clear, take all that into account. The diversion ratios include sorting patients based on why they went to the hospital. They include sorting patients based on how old they are. And they compare where would people like that go if their first choice wasn't available. And for five out of the six hospitals here, Northwestern Memorial was the first or second best alternative. So there are, you may not take your son to Northwestern Memorial if he breaks his leg, but you very well may drive past dozens of hospitals to deliver a baby at Northwestern Memorial. And the kinds, and many people do, and the kinds of services that people used to see. That seems to invite what the economists keep calling the silent majority fallacy, right? We know that a lot of, there's a significant fraction of people who are willing to make significant trips. But the economists are telling us not to assume that the other 70 or 75 or 80 percent of the patients are like those folks and willing to drive past 10 other hospitals to save 5 percent on their insurance policies. That's exactly why we use diversion ratios. Because diversion... You're reading out of, it's just so interesting. These same numbers are being used in diametrically opposed ways. We'll just have to decide what the right way to use it is. Because the FTC keeps saying, if you're going to lose half your market, you're going to, in lieu of losing half your market, you're going to say, okay, we'll cough up a little more money to keep you in the tent. And you don't seem to think that's what their reaction will be. But Brown-Shue asks the court to examine, what is the market in which consumers can practically turn? But who's the consumer? Here you're sliding over into the patients. And they are looking at the insurance companies. I did not mean to slide over the patients. And I also don't think, again, that there's a significant difference between the two. The district court in this case looked at diversion ratios because that's what the FTC's expert pointed to as the most important input to his analysis. So diversion ratios, that they do analyze what the alternatives are for patients, it's that kind of analysis that drives insurers. And the way we know that is, think about that Aetna testimony I pointed to a moment ago. When the Aetna representative says, we must have Advocate and North Shore to market a plan, the reason she said that was because she believes that the best substitute, the preferred substitute for hospitals like North Shore Highland Park would be Advocate Condell. That was the basis for her view, was about patient preferences. But the judge here examined that testimony and found it not credible because, in part, it was undermined by the diversion ratios. As I just showed, the diversion ratios show that she was mistaken about what the best alternative was. The best alternative for North Shore Highland Park is Northwestern. And she was simply wrong about that. Both for tiny fractions of the patient population. Correct. For all kinds of services. Could I ask you, Ms. Coble, if we were to find a reversible error here, what else is there for the district judge to decide here? And could you also address the timing question that I asked the FTC? Certainly. From the perspective of a remand, the only question, as I mentioned, the only question before the court today is, was there an adequate geographic market defined by the FTC? The FTC had the burden to do that. The district court found that the FTC had not identified an appropriate geographic market and this court reviews that for clear error. If the court were to remand, the district court, I assume, would follow whatever instructions this court set out for the appropriate way. I'm asking you, what instructions should we give them if we were, or is there, the FTC has just told us we ought to declare the geographic market settled. That would be fairly unprecedented. That's why I'm asking a question. At most, you would send it back and ask him to look at a different question, but to be honest, I'm not aware of a single court anywhere that has held that once the FTC's expert says that a SNP has been calculated, the district court may not reject that testimony by examining its assumptions. That's not the question. So this was a suit by the FTC for a preliminary injunction, and it went off the rails at the district court because of this geographic market issue. I thought, maybe you can tell me that I'm wrong, that your position would have been that's not everything that needs to happen before there is a preliminary injunction. Once you have the product and geographic markets settled, then you have to go on and ask the rest of the questions that the merger guidelines make relevant, including competitive effects and all the rest of it. So there are some steps that need to be taken before you actually have the preliminary injunction that the commission wants. You are, of course, correct. But I guess what I would say is if the court found that what the district court did here was inappropriate, there is more work to be done even on the geographic market. Because the hypothetical monopolist test, which, by the way, we don't quibble with. This case is not a referendum on the hypothetical monopolist test. But there's no single methodology identified by any case or even by the merger guidelines for calculating whether a hospital can impose a SNP. Dr. Ten chose a method for calculating a SNP that no court has ever approved and that is seriously flawed for all the reasons our expert revealed. These cases actually make it into the courts, I might observe. Correct. But he conceded that no court has ever accepted this particular method. And our expert offered various serious critique of that method. So we would, at a minimum, have to go back to have that analysis tested. I still don't see, by the way, how even a correct SNP test could solve the problem that the candidate market was ill-defined. And that's essentially what the FTC is arguing here. Now, even if we got back there and the district court said, yes, there's a geographic market, we would then go on to competitive effects and it would raise a presumption. And that presumption, respectfully, has already been rebutted. We have presented substantial evidence that the 45... Okay, you need to wrap up unless Judge Hamilton or Judge Bauer has any more questions. Thank you, Your Honor. Okay, thank you very much, Ms. Coberly. Anything further, Mr. Hoffman? Let me start with where Ms. Coberly ended with the remedy question. We certainly agree that there need to be further proceedings to address issues like competitive effects and whether there are efficiencies and so forth that would justify the merger, which are not for the Court. We do think that on this record the Court can find that the FTC showed a likelihood of success at the geographic market question. Again, it's important to recognize that we're not making a final determination about the market here. That's ultimately for the Commission to do. The question is whether we've shown a likelihood of success on that question. And when you look at the evidence, you'll see that Dr. Ten performed an analysis. Now, Ms. Coberly said, well, it used a model that's never been accepted by any Court. I think if you look at the evidence in this, you'll see that Dr. Ten says his model is well-grounded in the economic literature. It uses standard econometric techniques. Can I point to a specific case that's used this exact model the way Dr. Ten used it? No. And that's because every case, the facts and the data are different, and an economist needs to look at it and figure out what's the most appropriate way to model the effects of the transaction. Often in many cases, as you pointed out, there aren't that many of these cases that are reported, and an economist doesn't even know what's been used in a particular case. Courts don't usually produce a long appendix setting forth the economic model. So, the notion that Dr. Ten's model should be rejected because I can't point to a particular case in which that model is used is just absurd. I mean, the question is whether the model is well-grounded in economic techniques and econometric techniques, and there's no question that it was. As to the other side, what do the defendants have? They've not produced any hypothetical monopolist test. Their main concern, their main criticisms of Dr. Ten are that he didn't consider profitability, which he did. As I told you, he looked at cost data struck, cost data evidence. And then they give this example 6 argument, and we talked about that. Judge Wood, I think your comment about example 6 was exactly right, that defendants haven't shown that Northwestern Memorial, which is what Ms. Copley talked about, is a closer... It is product C. That's exactly where I wanted to go, because the evidence from the diversion ratios does seem to indicate that Northwestern Memorial is the most popular second choice for these parties' hospitals. It looks like a pretty darn good alternative for an awful lot of people. So, I'd like you to address specifically its exclusion from the market. Sure. Well, if you look at example 6, it explains what it means to be a closer substitute. And it says product C is a closer substitute if, in response to a snip on product A, more revenue will be diverted to C than to B. I'm paraphrasing, but I think that's what it says. And so, if you're looking at this from an insurer's perspective, which is the right way to do it, I think the question is if North Shore raises its prices, are insurers going to switch to Advocate or Northwestern Memorial? And the diversion ratios may be informative of that question, but they don't answer it. I think, as you see from the insurer testimony, which is very clear and is overwhelming, the insurers view Advocate and North Shore  as a substitute. But put all that aside for a second. Because this is a red herring. The only hospital that even arguably comes in under Defendant's example 6 theory is Northwestern Memorial. And they concede in closing argument that it doesn't matter if you took Dr. Ten's 11 hospital market and you added Northwestern Memorial and, say, you added President St. Francis for good measure. They conceded in closing argument that you would still have HHI levels and market shares that would make this merger presumptively anti-competitive. So all this stuff about how Northwestern Memorial and President St. Francis, which is really the focus of their brief, should be included, it's really all a distraction because, at the end of the day, everyone agrees that it doesn't matter. And, again, I think that's a further indication, a further reason why, on this case, that the government met its burden of showing a likelihood of success. A few other points I would briefly like to make. One extra minute because I think I gave Ms. Coberly one extra minute. No, I think, actually, I've said enough. I would just say we would ask that the unless the Court has further questions, we would ask that the judgment be reversed, that the Court find we've met our likelihood of success as to the relevant market, and thank you. Thank you as well, Ms. Coberly. Thanks to all.